## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*Filed Electronically: June 15, 2018*

IDEKER FARMS, INC., *et al*.,            )
                                          )
                    Plaintiffs,           )      Case No.:  1:14-cv-00183-NBF
          v.                              )
                                          )      Senior Judge Nancy B. Firestone
UNITED STATES OF AMERICA,                 )
                                          )
                    Defendant.            )

## UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

JEFFREY H. WOOD
ACTING ASSISTANT ATTORNEY GENERAL
United States Department of Justice
Environment & Natural Resources Division

TERRY M. PETRIE
CARTER F. THURMAN
EDWARD C. THOMAS
United States Department of Justice
Environment & Natural Resources Division
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1369
Fax: (303) 844-1350
E-mail: Terry.Petrie@usdoj.gov

*Attorneys for United States*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 1

    I.     The Proper Causation Standard Requires Consideration of All United States
          Actions That Address the Risk of Flooding on Plaintiffs' Property....................... 1

        a.     Plaintiffs' reliance on *John B. Hardwicke* does not cure their failure
              to account for all the United States' flood-risk reducing actions................ 3

        b.     The cases relied on in *St. Bernard Parish* demonstrate that the
              proper causation standard must account for all United States actions
              that address the relevant risk. ..................................................................... 5

        c.     The reasonable investment-backed expectations of the Plaintiffs are
              not part of the causation analysis. .............................................................. 8

        d.      Plaintiffs' claim fails under *John B. Hardwicke*. .................................... 10

    II.     The Proper Causation Standard Does Not Conflict with the *Miller* Doctrine,
          Or Any Other Precedent...................................................................................... 12

    III.    The Proper Causation Standard Is Not an Impermissible Exclusionary Rule. ..... 13

CONCLUSION................................................................................................................. 14

# TABLE OF AUTHORITIES

*Am. Pelagic Fishing Co. v. United States*,
   379 F.3d 1363 (Fed. Cir. 2004) ............................................................................ 2

*Ark. Game & Fish Comm'n v. United States*,
   568 U.S. 37 (2012).............................................................................................. 13

*Ark. Game & Fish Comm'n v. United States*,
   87 Fed. Cl. 594 (2009)......................................................................................... 9

*Ark. Game & Fish Comm'n v. United States*,
   736 F.3d 1364 (Fed. Cir. 2013) ......................................................... 5, 6, 9, 13, 14

*Ark. Game & Fish Comm'n v. United States*,
   637 F.3d 1366 (Fed. Cir. 2011) ........................................................................... 6

*Cary v. United States*,
   552 F.3d 1373 (Fed. Cir. 2009) ........................................................................ 6, 7

*ETSI Pipeline Project v. Missouri*,
   484 U.S. 495 (1988).......................................................................................... 11

*Huntleigh USA Corp. v. United States*,
   525 F.3d 1370 (Fed. Cir. 2008) ........................................................................... 2

*Ideker Farms, Inc. v. United States*,
   136 Fed. Cl. 654 (2018)................................................................................. 2, 3, 8

*In re Operation of Missouri River System Litigation*,
   421 F.3d 618 (Fed. Cir. 2005) ........................................................................... 11

*John B. Hardwicke Co. v. United States*,
   467 F.2d 488 (Ct. Cl. 1972).......................................................................... 4, 5, 8

*Love Terminal Partners, LLP v. United States*,
   889 F.3d 1331 (Fed. Cir. 2018) .................................................................. 9, 11, 12

*Nicholson v. United States*,
   77 Fed. Cl. 605 (2007)......................................................................................... 2

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984)............................................................................................. 9

*South Dakota v. Ubbelohde*,
   330 F.3d 1014 (2003).................................................................................... 11, 12

*St. Bernard Parish v. United States*,
   887 F.3d 1354 (Fed. Cir. 2018) ................................... 1, 2, 3, 4, 5, 6, 7, 8, 9, 12, 13

*United States v. Miller*,
   317 U.S. 369 (1943)................................................................................. 8, 12, 13

*United States v. Reynolds*,
   397 U.S. 14 (1970)................................................................................................ 8, 14

*United States v. Sponenbarger*,
   308 U.S. 256 (1939).................................................................................................. 2

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
   449 U.S. 155 (1980).................................................................................................. 9

*Wyatt v. United States*,
   271 F.3d 1090 (Fed. Cir. 2001) .............................................................................. 2

## <u>STATUTES</u>

16 U.S.C. § 661.......................................................................................................... 11

## <u>RULES</u>

RCFC 59(a)................................................................................................................ 14

## INTRODUCTION

As set forth in the United States' motion for reconsideration, the Court should reconsider its trial opinion, vacate its findings on causation, apply the correct legal standard for causation set forth in *St. Bernard Parish*, and dismiss all of Plaintiffs' claims for failure of proof on causation.  *See* U.S. Mot. for Recons. ("U.S. Mot.") 1-7, ECF No. 436.  In *St. Bernard Parish*, the Federal Circuit specifically and plainly held that the correct "causation analysis must consider the impact of the entirety of the government actions that address the relevant risk."  *St. Bernard Parish v. United States*, 887 F.3d 1354, 1364 (Fed. Cir. 2018).  This holding is not complicated.  Yet, Plaintiffs argue that the specific facts in *Ideker* allow this Court to circumvent *St. Bernard Parish's* holding and ignore several of the considerable flood-risk reducing actions taken by the United States along the Missouri River because of *when* the United States initially took such actions—regardless of whether those actions reduced the risk of flooding at the time of the alleged takings.  In making that overarching argument, Plaintiffs misconstrue bedrock principles of Fifth Amendment jurisprudence by conflating the threshold issue of causation with the reasonable investment-backed expectations of the individual Plaintiffs and concepts related to the appropriate measure of just compensation.  Plaintiffs also make equitable arguments that misinterpret case law and ignore the crucial aspects of the United States' flood control infrastructure.  As set forth below, and in the United States' other briefs discussing *St. Bernard Parish*, the Court should reject Plaintiffs' arguments and rule for the United States.

## ARGUMENT

### I.     The Proper Causation Standard Requires Consideration of All United States Actions That Address the Risk of Flooding on Plaintiffs' Property.

Plaintiffs' claims fail because to meet their causation burden, they must account for all the flood-risk reducing effects of the actions taken by the United States with respect to Plaintiffs'

1

properties.  U.S. Mot. 3-7; U.S. Resp. to Pls.' Br. regarding the Impact of *St. Bernard Parish* on

Pls.' Mot. for Recons. ("U.S. Resp.") 2-8, ECF No. 441.  As stated in *St. Bernard Parish*, the

"governing Supreme Court and Federal Circuit authority . . . establish[es] that the causation

analysis must consider the impact of the entirety of the government actions that address the

relevant risk."  887 F.3d at 1364.  The Federal Circuit further stated "[i]t is well established that

a takings plaintiff bears the burden of proof to establish that the government action caused the

injury" and that "the causation analysis requires the plaintiff to establish what damage would

have occurred without government action."  *Id.* at 1362-63.  Thus, causation is a threshold issue.

And when a plaintiff fails to prove causation, the Court does not need to address any further

arguments related to liability—like foreseeability, severity, or reasonable investment-backed

expectations.  *See id.* at 1362 (holding that the court did not need to address foreseeability

because "plaintiffs have failed to establish that the construction or operation of MRGO caused

their injury").[1]

In this case, "[t]o meet the demands of settlers and minimize flooding," the United States

built a series of reservoirs that regulated flood flows, constructed and repaired levees that helped

contain flooding, and implemented the BSNP that enabled navigation and benefited flood control

and has operated for decades.  *Ideker Farms, Inc. v. United States*, 136 Fed. Cl. 654, 660-662

---

[1] Similarly, the Court need not address liability for a taking when a plaintiff does not have a valid
property interest.  *See Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377-78 (Fed. Cir.
2008); *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("only persons with a valid
property interest at the time of the taking are entitled to compensation." (citations omitted)).
Then, if the plaintiffs have a valid property interest, the plaintiff must establish that the alleged
government action amounts to a "compensable taking of that property interest."  *Huntleigh USA
Corp.*, 525 F.3d at 1378 (quoting *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372
(Fed. Cir. 2004)).  Here, Plaintiffs do not have a valid property interest in the United States
providing a certain level of flood protection.  *Nicholson v. United States,* 77 Fed. Cl. 605, 624,
(2007) (quoting *United States v. Sponenbarger*, 308 U.S. 256, 266 (1939)).

(2018).  The reservoirs serve multiple purposes, which include flood risk reduction.  *Id.*

Similarly, the federal levee system was constructed to help contain flooding in sections of the

River below the reservoirs, *id.* at 660, and "runs continuously for 100 miles," *id.* at 701.  The

Court found that the BSNP aided navigation and flood control, *id.* at 661, and "led to the

accretion of tillable farmland along the River . . . extending the land into what was previously

water.  Many of the properties involved in this litigation were created from the above-described

accretion," *id.* at 663.  This Court found, as Plaintiffs argued, that these measures all contributed,

and still contribute, to "flood control . . . [i]n fact, the Corps' operation of the System and its

operations and maintenance of the BSNP work hand-in-hand to provide flood control."  *Id.* at

662.  And since their implementation, flooding has been "less frequent and less severe."  *Id.* at

670.  Because Plaintiffs failed to account for these actions, Plaintiffs failed to prove causation.

Plaintiffs make several arguments to the contrary in their response brief but each argument fails.

> **a.**     **Plaintiffs' reliance on *John B. Hardwicke* does not cure their failure to account for all the United States' flood-risk reducing actions.**

Plaintiffs mistakenly argue that *St. Bernard Parish* left open the issue whether causation

in a case like *Ideker* requires the Court to consider all of the United States' actions related to

flood control when the flood-risk reducing actions allegedly occurred prior to the flood-risk

increasing actions.  Pls.' Combined Resp. to U.S. Resp. to Court's Order Directing Briefing on

Effects of *St. Bernard Parish* Decision, and U.S. Mot. for Recons. ("Pls.' Resp.") 5, 6, ECF No.

440.[2]  Plaintiffs are wrong.  They base their argument on a misinterpretation of the Federal

---

[2] Plaintiffs state that "for purposes of this briefing, [they] are distinguishing *St. Bernard Parish* based upon the Federal Circuit's own admission" but that Plaintiffs "are reserving the right to argue that the analysis of *St. Bernard Parish* is misguided in any event."  Pls.' Resp. 1 n.1.  But Plaintiffs opportunity to articulate how *St. Bernard Parish* impacts the pending motions for reconsideration has passed.  *See* ECF No. 439 (Order) (stating that the parties are to address the impacts of *St. Bernard Parish*).

Circuit's brief discussion of the *John B. Hardwicke* case, and ignore the main holding of *St. Bernard Parish*.[3]   Pls.' Resp. 5, 6.

A brief review of *John B. Hardwicke v. United States* and the Federal Circuit's discussion of that case in *St. Bernard Parish* is instructive.   In *John B. Hardwicke*, a dam near plaintiffs' property decreased flood risk and then a second dam later increased flood risk.   467 F.2d 488, 488-89 (Ct. Cl. 1972).   In that case, the court properly looked at the overall impact of government action to determine that flood risk was still far less than if there had been no government action at all.   *John B. Hardwicke*, 467 F.2d at 488-89; *see also St. Bernard Parish*, 887 F.3d at 1364.   In *St. Bernard Parish*, the Federal Circuit cited *John B. Hardwicke* favorably in support of its holding "that the causation analysis must consider the impact of the *entirety* of government actions that address the relevant risk."   *St. Bernard Parish,* 887 F.3d at 1364 (emphasis added) (citing *John B. Hardwicke*, 467 F.2d 488, after discussing the same concept in *Sponenbarger*).   Later in the opinion, the Federal Circuit cited *John B. Hardwicke* in a footnote stating that it "*suggested* that if the risk-reducing government action preceded the risk-increasing action, the risk reducing action would only be considered if the risk-increasing action was 'contemplated' at the time of the risk-reducing action."   *Id.* at 1367 n.14 (emphasis added).   The

---

[3] Plaintiffs argue that *St. Bernard Parish* recognized that the *John B. Hardwicke* approach might be the correct standard for assessing causation and that the *John B. Hardwicke* approach actually is the correct standard.   Pls.' Resp. 5, 6.   But *St. Bernard Parish* did not recognize that *John B. Hardwicke* articulated or "might" articulate the correct standard for assessing causation. Plaintiffs incorrectly state that the Federal Circuit was discussing the "holding" in *John B. Hardwicke* when it stated that "if the risk-reducing government action preceded the risk-increasing action, the risk-reducing action would only be considered in assessing causation if the risk-increasing action was 'contemplated' at the time of the risk-reducing action."   Pls.' Resp. 5 n.2; *Id.* at 6 n.3.   That is not the holding of *John B. Hardwicke* as explained by the Federal Circuit in *St. Bernard Parish*.   The Federal Circuit made clear that this aspect of *John B. Hardwicke* was dicta.   *St. Bernard Parish*, 887 F.3d at 1367 n.14.

Federal Circuit made clear that this aspect of *John B. Hardwicke* was dicta (*i.e.*, a "suggest[ion]" that was not necessary to the result, since the court ruled for the United States). *Id.* And *St. Bernard Parish* certainly did not endorse that dicta—to the contrary, it expressly reserved judgment on "[w]hether the John Hardwicke approach is correct." *Id.* As discussed below, the fundamental logic of *St. Bernard Parish*—and the precedent on which the Federal Circuit relied—make clear that the *John B. Hardwicke* dicta is wrong and that Plaintiffs' reliance on that dicta does not cure their failure to prove causation.[4]

      **b.**    **The cases relied on in *St. Bernard Parish* demonstrate that the proper causation standard must account for all United States actions that address the relevant risk.**

Plaintiffs' interpretation of *John B. Hardwicke* conflicts with binding precedent. The *John B. Hardwicke* dicta is not the correct standard as it conflicts with more recent Federal Circuit precedent cited in *St. Bernard Parish*. *Id.* at 1364-65. For example, the Federal Circuit relied directly on *Arkansas Game & Fish Commission*, which involved a factual scenario similar to *Ideker*, where the Corps built the Clearwater Dam in the 1940s for "flood control purposes" and then deviated from the operations manual in the 1990s. *Id.* (citing *Ark. Game & Fish Comm'n*, 736 F.3d at 1372.[5]

---

[4] Also, the footnote upon which Plaintiffs rely is located in the section of *St. Bernard Parish* explaining that separate actions that are not the result of the same project must be considered if they are "directly related to preventing the same type of injury on the same property where the damage occurred." 887 F.3d. at 1366. Absent from the Court's description of the holding is any distinction between the order of the actions.

[5] In an apparent attempt to distinguish *Arkansas Game and Fish Commission*, Plaintiffs state that the "original dam construction was not a risk-reducing action insofar as its releases were set to 'mimic the pre-dam water flows.'" Pls.' Resp. 7 n.4 (quoting *Ark. Game & Fish Comm'n*, 736 F.3d at 1372 n.2). Plaintiffs' selective quotation is misleading—the dam was constructed "for flood control purposes." *Ark. Game & Fish Comm'n*, 736 F.3d at 1367-68. And the Army Corps of Engineers ("Corps") adopted a water control plan to control river flows "to reduce the adverse effects of flooding in downstream areas." *Ark. Game & Fish Comm'n v. United States*,

Similarly,[6] *St. Bernard Parish's* reliance on *Cary v. United States*, 552 F.3d 1373, 1375 (Fed. Cir. 2009), further establishes that the timing of the United States' actions is not determinative.  In *Cary*, a hunter started a forest fire and the United States was sued for a taking because it had left dead wood in the forest, which made the forest fire worse than it would have been without the dead timber.  Plaintiffs in *Cary* alleged that certain government fire-suppression policies and visitor policies caused the fire and constituted a taking because the policies increased the risk of fires.  In explaining that a takings plaintiff must show that the injury is the "direct, natural, and probable result" of government action, the Federal Circuit explained that "government action" includes all of the government's actions, *Cary*, 552 F.3d at 1377 n.*, which included "a long sequence of decisions, some risk-increasing but others risk-decreasing, spread out over decades" *id.* at 1379.  The Federal Circuit rejected plaintiffs' attempt to "cherry-pick parts of the [government] policy which they argue[d] ha[d] increased the risk of wildfire since 1911 without acknowledging that much of the [government] policy over the last century ha[d] been devoted to reducing the risk of wildfire."  *Id.* at 1377 n.*.  The Federal Circuit explained that "each risk-decreasing action in the Forest Service's policies is an intervening act breaking whatever causal chain would lead from an accused risk-increasing action to the conflagration which destroyed the landowners' property."  *Id.* at 1379.  Faced with that timeline of events, the Federal Circuit in *St. Bernard Parish* cited *Cary* and stated that "the causation analysis must consider both risk-increasing and risk-decreasing government actions over a period of time to

_____

637 F.3d 1366, 1367 (Fed. Cir. 2011), *rev'd and remanded by* 568 U.S. 23 (2012).  The deviations from that water control plan were what gave rise to the suit and what were found to have caused flood damage that was worse than what was experienced before the dam was constructed.  *Ark. Game & Fish Comm'n*, 736 F.3d at 1367-68, 1371-72 & n.2.

[6] The United States addressed several of these cases in its response to Plaintiffs' Brief Regarding the Impact of *St. Bernard Parish*.  *See* U.S. Resp. 4-7.

determine whether the totality of the government's actions caused the injury." *St. Bernard Parish,* 887 F.3d at 1365. After citing *Cary* and other cases discussed in the United States' Response, ECF 441 at 6-7, the Federal Circuit reiterated that "the causation analysis requires the plaintiff to establish what damage would have occurred without government action," without any delineation of the order of actions taken. *St. Bernard Parish*, 887 F.3d at 1363. Thus, the only relevant holding from *St. Bernard Parish* is the requirement to consider the entirety of the United States' actions.

These cases emphasize the importance of analyzing all of the United States' actions that address the "relevant risk," even if those actions are separated by many years and involve separate efforts to address the risk. Both *Arkansas Game & Fish Commission* and *Cary* involved situations in which many decades separated some of the flood-risk reducing actions and the flood-risk increasing actions. In *Arkansas Game & Fish Commission*, the Clearwater Dam was built in the 1940s and the complained-of deviations occurred in the 1990s. In *Cary*, the risk-reducing and risk-increasing decisions were intermingled over decades. 552 F.3d at 1377 n.*. Thus, contrary to Plaintiffs' assertions, there is no expiration date or temporal litmus test on the United States' actions that decrease the risk of flooding. *See* Pls.' Resp. 2-3. Such an approach would lead to arbitrary results that fail to consider the entirety of the United States' actions. This is especially important when analyzing the United States' actions related to flood control because of the complex nature of flood control projects and the significant investment and changes required to those projects or systems over the course of many decades.

Instead of acknowledging these cases, Plaintiffs borrow concepts from cases that did not involve an issue of causation. Plaintiffs argue that the approach in *John B. Hardwicke* "is binding on the Federal Circuit and this Court, and is not an open question of law." Pls.' Resp. 6.

They state that the Federal Circuit in *St. Bernard Parish* explained that the *John B. Hardwicke* approach is "dictated by Supreme Court's holdings in *United States v. Miller*, 317 U.S. 369 (1943) and *United States v. Reynolds*, 397 U.S. 14 (1970) . . . ." *Id.* Plaintiffs again misread *St. Bernard Parish*. Similar to the plaintiffs' argument in *St. Bernard Parish*, Plaintiffs here "rely on authorities not directed to causation, but rather concerned with the extent of the economic injury sustained by the plaintiffs or the amount of a just compensation award. In assessing economic loss for regulatory takings, the entirety of government action must be considered." 887 F.3d at 1366; *see* Pls.' Resp. 6-11 (citing *Miller*, *Fuller*, *Reynolds*, and several direct condemnation cases from various courts). "And in determining just compensation, offsetting benefits may be considered." *St. Bernard Parish,* 887 F.3d at 1366 (citing *Miller*, 317 U.S. 369). But the discussion of offsetting benefits in *Miller* and *Reynolds* "did not involve an issue of causation." *Id.* As such, Plaintiffs' reliance on concepts from cases that did not involve an issue of causation does not support their position.

> c.     **The reasonable investment-backed expectations of the Plaintiffs are not part of the causation analysis.**

Contrary to Plaintiffs' assertions, the "reasonable investment-backed expectations" of the various Plaintiffs plays no role in the threshold causation analysis. *Ideker Farms*, 136 Fed. Cl. at 672. The entire concept of reasonable investment-backed expectations is only relevant *after* a court determines that a plaintiff has a valid and compensable property interest and that the United States caused the alleged injury. The same is true of the elements of foreseeability or severity. *St. Bernard Parish*, 887 F.3d at 1362 (stating that the question of foreseeability need not be considered because plaintiffs failed to establish causation). Even so, Plaintiffs argue that the *John B. Hardwicke* approach recognizes that the proper standard for assessing causation requires consideration of a plaintiff's reasonable investment-backed expectations. Pls.' Resp. 6-

7.  Plaintiffs rely on the Supreme Court's statement in *Arkansas Game and Fish Commission* that "'[t]he determination whether a taking has occurred includes consideration of the property owner's distinct investment-backed expectations[.]'"  Pls.' Resp. 7.  But just because a plaintiff's reasonable investment-backed expectations are relevant for determining the United States' *liability* for a taking, such consideration is not required in "a determination of which government acts must be included in the 'but for' analysis of causation."  *Id.*[7]  In fact, the plaintiff in *Arkansas Game & Fish Commission* did not acquire its property until after construction of the Dam.  736 F.3d at 1372 n.2; *Ark. Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 600-03 (2009), *aff'd*, 736 F.3d 1364 (Fed. Cir. 2013).[8]  Plaintiffs have not cited any controlling precedent in which the causation analysis was combined with or preempted by a plaintiff's reasonable investment-backed expectations.

---

[7] Here, Plaintiffs argue that because there was "no nexus" between the United States' actions, Plaintiffs should not be required to account for those earlier actions. Pls.' Resp. 11.  They argue that "the length of time elapsing between the Government's actions" is relevant in determining what actions should be considered. *Id.*  As support, Plaintiffs rely on authorities not directed to causation, but rather concerned with the amount of just compensation in direct condemnation proceedings.  These cases "did not involve an issue of causation."  *St. Bernard Parish*, 887 F.3d at 1366.  Moreover, any argument that there is "no nexus" between the United States' operations prior to 2004 and its operations after 2004 ignores reality.  The complained-of releases began in 1986 under the previous Master Manual.  U.S. Post-Trial Br. 13, ECF No. 375; Tr. at 7867:25 to 7868:3 (Farhat) (explaining that releases for threatened and endangered species have occurred since 1986).  And habitat construction began in 1995.  *See* U.S. Post-Trial Br., Table 1.

[8] Plaintiffs again state that they each obtained "title to their lands well after the construction of the System and BSNP was completed."  Pls.' Resp. 10.  To the extent Plaintiffs are arguing they had reasonable investment-backed expectations in a certain level of benefit, numerous Plaintiffs also purchased their property *after* the Master Manual update began (*i.e.*, 1989), Tr. at 6868:5-11 (Farhat), and *after* habitat construction was considered (*i.e.*, 1970s), DX573 at 31 & Tr. at 8878:12 to 8893:4 (Fischer).  Thus, Plaintiffs' reasonable investment-backed expectations must be analyzed in the context of the Corps' actions.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005-06 (1984) (investment-backed expectation "must be more than a 'unilateral expectation or an abstract need.'" (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980))); *Love Terminal Partners, LLP v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018) (similar).

> **d.** **Plaintiffs' claim fails under *John B. Hardwicke*.**

Even if Plaintiffs' reliance on dicta from *John B. Hardwicke* were correct, Plaintiffs'

claims still fail.  Plaintiffs first argue that the Corps' risk-reducing activities predate the alleged

risk-increasing activity.  Pls.' Resp. 8-9.  But, the United States' actions that reduce the risk of

flooding on Plaintiffs' properties have continued long after dam construction.  The Corps

continually makes operational decisions at the reservoirs to provide flood risk reduction that

benefits plaintiffs.  *See e.g.*, PX 4 at USACE0002567 (stating that "[s]ince regulation of the

system commenced, there would have been many more flood occurrences were it not for the

upstream regulation."); Tr. at 7217:16 to 7218:9 (Farhat) (describing reduction in releases in

2016 due to high tributary flows); Tr. at 6943:1 to 6944:4 (Farhat) (discussing operational

flexibility used only since mid-2000s to release below navigation targets which provide flood

risk reduction benefits).  Further, each year the United States spends millions on the maintenance

and operations of the dams and BSNP structures that reduce the risk of flooding on Plaintiffs'

properties.  Tr. at 6549:12-6550:2, 6550:21-23, 6551:25-6552:5 (Ponganis); 9208:19-9209:8,

9211:19-21, 9212:7-9213:4 (Pridal); 8990:12-8991:1, 9016:23-9019:13 (Chapman).  After each

major flood, the Corps repairs and rebuilds the federal and non-federal levees that provide flood

protection to Plaintiffs' properties.  Tr. at 12061:11-20, 12063:23-12064:18, 12065:12-25

(Flere); Tr. at 12600:10-12602:5, 12613:14-19, 12613:19-21, 12617:18-12618:19, 12638:18-

12639:4, 12641:19-22, 12642:22-25, 12644:5-8 (Kneuvean).  Plaintiffs' argument, even if it

were a correct statement of the law, improperly ignores the myriad actions of the United States

subsequent to dam and levee construction that reduced the effects of flooding on their

properties.[9]

---

[9] Of the remaining Plaintiffs, twenty two are behind levees that have been repaired since 2004.

Plaintiffs next argue that the changes adopted pursuant to the revised Master Manual were not "contemplated at the time of the government actions decreasing the risk of flooding." Pls.' Resp. 8-9.  However, changes to the operations of the reservoirs were clearly contemplated as it is a multiple-purpose system, which includes operations for fish and wildlife, and congress entrusted the Corps with discretion in balancing those authorized purposes.  *See, e.g.*, PX3 at USACE0004041 (1979 Master Manual stating "[a]s water resources development progresses, or as a result of changing national and regional goal and policies, service requirements for the mainstem system and its components will change."); *id.* at USACE0003942; *see also* 1944 Flood Control Act Section 9 (approving and authorizing comprehensive plans "for flood control and other purposes in the Missouri River Basin"); *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 500, 502 (1988) (citing "Pick Plan" set forth in H.R. Doc. No. 475, 78th Cong., 2d Sess., 29 (1944) and adopted in Section 9 of the 1944 Act, for multiple purposes including "wildlife"); *In re Operation of Missouri River System Litigation*, 421 F.3d 618, 629-30 (citing *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1019-20, 1027 (2003) (1944 FCA balances "dominant functions" of flood control and navigation with "secondary uses including…fish, and wildlife," and "[t]he Corps' balancing of water-use interests in the 2004 Master Manual is in accordance with the FCA."); *see also* 16 U.S.C. § 661 et seq.  And Plaintiffs explicitly acknowledge such changes in operation—Plaintiffs attempted to prove causation based on the 1979 Master Manual, which was the third rendition of the original 1960 Manual.  The fact that the Master Manual has evolved shows that changes in operations like those that are the basis of Plaintiffs' claims always have been contemplated.

II.     **The Proper Causation Standard Does Not Conflict with the *Miller* Doctrine, Or Any Other Precedent.**

Plaintiffs argue that a causation standard that requires consideration of all United States actions that impact flooding on Plaintiffs' property "runs contrary to well-established Fifth Amendment and condemnation law which establishes how compensation is calculated for condemnation, whether inverse or direct."  Pls.' Resp. 13.  Plaintiffs first rely on authorities "determin[ing] whether and to what extent compensation is owed for lands condemned by the government."  *Id.*  But as stated above, reliance on direct condemnation cases provides no support as they "did not involve an issue of causation."  *St. Bernard Parish*, 887 F.3d at 1366; *see* Pls.' Resp. 13-18 (citing only direct condemnation cases).[10]

Plaintiffs argue, however, that the Federal Circuit recently reiterated that "the *Miller* rule applies to the question of whether property has been taken in the first place."  Pls.' Resp. 19 (citing *Love Terminal Partners*, 889 F.3d 1331).  But there was no issue of causation in *Love Terminal Partners*.  Instead, *Love Terminal Partners*' discussion of *Miller* was in the context of assessing the economic impact of a particular government action.  889 F.3d at 1346-47.  Such discussion is in line with *St. Bernard Parish's* statement about whether the *Miller* doctrine is even relevant to determining causation.  887 F.3d at 1366 n.14.  As such, Plaintiffs' reliance on *Love Terminal Partners* is misplaced.

Lastly, Plaintiffs argue that *Miller* cannot be distinguished "as applicable only to direct condemnation actions but not Fifth Amendment takings cases."  Pls.' Resp. 19.  But Plaintiffs

---

[10] Plaintiffs argue that the Federal Circuit in *St. Bernard Parish* "went out of its way to note that it was not intending to curtail or contravene *Miller*."  Pls.' Resp. 15 (citing *St. Bernard Parish*, 887 F.3d at 1367 n.14).  But the *Miller* doctrine is only relevant to the issue of just compensation and the Federal Circuit stated that it was not addressing whether "the *Miller* doctrine is even relevant to determining causation" because it was not raised in that case.  887 F.3d at 1366 n.14.

themselves concede that this issue is relevant to "whether *compensation* is owed and the *measure of compensation*." *Id.* (emphasis added) (citing cases discussing the appropriate measure of compensation due). Again, *Miller* did not "involve an issue of causation." *St. Bernard Parish*, 887 F.3d at 1366.

### III. The Proper Causation Standard Is Not an Impermissible Exclusionary Rule.

The United States' assertion that *St. Bernard Parish* requires this Court to consider all of the United States' actions that address flood risk does not amount to an "impermissible exclusionary rule" as suggested by Plaintiffs. Pls.' Resp. 20. In *Arkansas Game and Fish Commission*, the court stated that flooding cases should be assessed with reference to the "'particular circumstances of each case and not by resorting to blanket exclusionary rules." 568 U.S. at 37. But Plaintiffs take that statement out of context and suggest that because they have not, and likely cannot, meet their causation burden, the result is an "impermissible exclusionary rule." *Arkansas Game and Fish Commission* provides no support for Plaintiffs' position. To the contrary, *Arkansas Game and Fish Commission* illustrates that not all takings claims fail under the appropriate analysis for causation. The plaintiff in *Arkansas Game and Fish Commission* successfully established that the complained-of releases caused flooding on its property where the "proper comparison would be between the flooding that occurred prior to the construction of [the dam] and the flooding that occurred during the deviation period." *St. Bernard Parish*, 887 F.3d at 1364-65 (citing *Ark. Game and Fish Comm'n*, 736 F.3d 1364, 1367 n.2). It is of no consequence that the releases were set to mimic the pre-dam water flows in *Arkansas Game and Fish Commission*—those were just the "particular circumstances" of that case. Here, Plaintiffs chose to bring a case where the "particular circumstances" included the largest reservoir system in North America, hundreds of miles of levees, and the Bank Stabilization and Navigation

13

Project.  As such, requiring Plaintiffs to account for the entirety of the United States' relevant actions is not an exclusionary standard.

Second, Plaintiffs again argue that "practically speaking, no claim of taking by flooding with respect to the Missouri River could ever be maintained under that standard."  Pls.' Resp. 21. Plaintiffs go so far as to say that considering the entirety of the United States' actions that address flood risk in *Ideker* would result in a standard that "defies practical workability" and would "create[] an absurd result."  *Id.* at 21-22.  Plaintiffs' argument is extreme.  It would require this Court to ignore the flood-risk decreasing actions of the United States that benefitted the Plaintiffs' properties *at the time* of the taking.  Such an arbitrary approach defies reason and would itself lead to "an absurd result."  Such an approach also fails to account for the complex nature of flood control systems, which continue to provide flood risk reduction and require significant financial resources for maintenance and repairs so they can confer a *current* flood-risk reducing benefit.  Just because Plaintiffs' claims fail under the causation standard is not a flaw in the causation standard; it is a flaw in Plaintiffs' claims.  *See Ark. Game and Fish Comm'n*, 736 F.3d 1364 (describing plaintiffs' successful taking-by-flooding claim).

## CONCLUSION

Plaintiffs and this Court failed to apply the correct causation standard, which required the causation analysis to include *all* government actions that reduce the risk of flooding along the Missouri River.  This failure was clear legal error and, with respect to Plaintiffs, a failure of proof on a threshold legal issue.  Therefore, the Court should reconsider its trial opinion under RCFC 59(a), vacate its findings on causation, and find that Plaintiffs' failure of proof requires dismissal of all Plaintiffs' claims.

Respectfully submitted this 15th day of June, 2018.

JEFFREY H. WOOD
ACTING ASSISTANT ATTORNEY GENERAL
United States Department of Justice
Environment & Natural Resources Division

 *s/ Terry M. Petrie*
TERRY M. PETRIE
CARTER F. THURMAN
EDWARD C. THOMAS
United States Department of Justice
Environment & Natural Resources Division
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1369
Fax: (303) 844-1350
E-mail: Terry.Petrie@usdoj.gov

**Attorneys for United States**